In re SOUTH BAY MEDICAL ASSOCI-
ATES dba Suncrest Hospital of South
Bay, Debtor and Debtor–in–Possession.

The OFFICIAL COMMITTEE OF
UNSECURED CREDITORS,
Plaintiff,

v.

RIVIERA MEDICAL DEVELOPMENT
CORPORATION; and Does 1 through
10, inclusive, Defendant.

RIVIERA MEDICAL DEVELOPMENT
COMPANY, a California limited
Partnership, Counter-claimant,

v.

The OFFICIAL COMMITTEE OF UNSE-
CURED CREDITORS; South Bay Medi-
cal Associates dba Suncrest Hospital of
South Bay; Charter Medical Corpora-
tion, a Delaware corporation; Charter
Hospital of Torrance, Inc. formerly
known as Charter Pacific Hospital, Inc.,
a California corporation, Counter-defen-
dants.

Bankruptcy No. SA 92–22018 JW.
Adv. No. SA 94–1228 JW.

United States Bankruptcy Court,
C.D. California.

Aug. 9, 1995.

William Weinberger, Selvin & Weiner &
Weinberger, Los Angeles, CA, and Jeremy
Richard, Pachulski, Stang, Ziehl & Young,
Los Angeles, CA, for Riviera Medical Devel-
opment Co., defendant and counter-claim-
ant/third party plaintiff.

Sheri Bluebond, Irell & Manella, Los An-
geles, CA, for Charter Medical Corp. and
Charter Hosp. of Torrance, Inc., third party
defendants.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

The Official Committee of Unsecured
Creditors ("Committee)" filed an adversary
action on behalf of the estate against the
Debtor's former lessor, Riviera Medical De-

velopment Company ("Riviera"), seeking the recovery of preferential transfers and damages for violation of the automatic stay. Riviera initiated a third party indemnity action against the original lessee, Charter Hospital of Torrance, Inc. ("Charter Hospital") and its guarantor Charter Medical Corporation ("Charter Medical") (Charter Hospital and Charter Medical are collectively referred to as "Charter"), who had subleased the premises to the Debtor. Summary judgment was rendered in favor of the Committee on its claim for violation of the automatic stay and, in part, on the preference claim. Subsequently, Riviera filed a motion for summary judgment against Charter on its counterclaim for indemnity. The issues before this court are whether Charter is required to indemnify Riviera for (1) the attorneys' fees incurred by Riviera in defending the Committee's action, (2) the attorneys' fees incurred by Riviera in bringing and pursuing the third party indemnity action, and (3) the award against Riviera for violation of the automatic stay.

## I. STATEMENT OF UNDISPUTED FACTS

Riviera is a limited partnership organized and existing in the State of California. Riviera was lessor and Charter Hospital was lessee under an Amended and Restated Hospital Lease (the "Lease"). The Lease was entered into on or about August 1, 1986, and remained in full force and effect at all times relevant herein. A true and correct copy of the Lease was attached to Riviera's Motion for Summary Judgment ("Riviera Motion") as Exhibit "A".

Paragraph 17 of the Lease provides, in relevant part:

... Lessee hereby indemnifies and agrees to hold Lessor exempt and harmless (including reasonable attorneys' fees and costs) from and against all liabilities, obligations, claims, damages, penalties, causes of action (whether in law, equity or otherwise), costs and expenses imposed upon or incurred by or asserted against Lessor or the Property by reason of the occurrence or existence after the commencement of the term of this Lease of any of the following unless the same results solely from any negligent act of Lessor:

A. Any accident, injury to or death of persons (including workers) or loss of or damage to property occurring on or about the Property or any part thereof or the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways; or

B. Any use, non-use or condition of the Property or any part thereof or the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways; or

C. Any failure on the part of Lessee to perform or comply with any of the terms of this Lease;

D. Performance of any labor or services or the furnishing of any materials or other property in respect to the Property or any part thereof. In case any action, suit or proceeding in law, equity, or otherwise of any nature, kind or description is brought against Lessor by reason of any such occurrence, Lessee, upon Lessor's request, will at Lessee's expense resist and defend such action, suit or proceeding, or cause the same to be resisted and defended by counsel mutually agreed upon by and between Lessor and Lessee.

At or about the inception of the Lease, Charter Hospital provided Riviera with a security deposit in the amount of one month's rent (currently approximately $40,000.00) to secure performance of its obligations under the Lease (the "Original Security Deposit"). This Original Security Deposit has not been applied by Riviera.

On or about August 1, 1986, Charter Medical executed a written Guaranty in favor of Riviera by which it unconditionally guaranteed "timely performance of all obligations including but not limited to the payment of all monies due to [Riviera], covenants and conditions" required to be performed under the Lease. A true and correct copy of the Guaranty is attached to the Riviera Motion as Exhibit "B".

Riviera obtained and perfected a lien on personal property at the leased premises to secure performance of the obligations under the Lease and the Guaranty.

On or about January 15, 1991, the Lease was amended by a written Amendment No. 1 to Amended and Restated Hospital Lease Dated August 1, 1986 ("Lease Amendment"). A true and correct copy of the Lease Amendment was attached to the Riviera Motion as Exhibit "C".

In or about March 1991, Charter Hospital assigned the Lease to South Bay Medical Center, Inc. ("SBMC"), which thereafter assigned the Lease to South Bay Medical Associates, the debtor in this Chapter 11 case (the "Debtor" or "SBMA"). In connection with this assignment, Charter Hospital and Charter Medical (collectively "Charter"), Riviera and SBMC entered into a "Consent of Lessor to Leasing Agreement with Respect to Amended and Restated Hospital Lease Dated August 1, 1986, as Amended by Amendment No. 1 Dated January 15, 1991" ("Lessor's Consent"). A true and correct copy of the Lessor's consent was attached to the Riviera Motion as Exhibit "D".

In or about March or April 1991, Charter, Riviera and SBMC also entered into an "Amendment No. 1 to Consent of Lessor to Leasing Agreement with Respect to Amended and Restated Hospital Lease Dated August 1, 1986, as Amended by Amendment No. 1 Dated January 15, 1991" ("Amendment to Lessor's Consent"). A true and correct copy of the Amendment to Lessor's Consent was attached to the Riviera Motion as Exhibit "E".

Paragraph 4 of the Amendment to Lessor's Consent provided that:

... [L]essor will agree to accept from SBMA the sum of Two Hundred Seventy Thousand Dollars ($270,000), in the form of a certificate of deposit to be ·assigned to Lessor, as an additional security deposit, to be held and administered by Lessor in accordance with the provisions of Paragraph 5 of the Lease; provided, however, said sum, upon the written direction of Lessee, or without such direction, shall first be utilized by Lessor to satisfy any past due or unpaid monetary obligations of SBMA under the Lease. Neither Charter Hospital of Torrance, Inc. nor Charter Medical Corporation shall have any obligation to replenish any part of said Two Hundred Seventy Thousand Dollars that is utilized to satisfy any past due or unpaid monetary obligations of SBMA....

In accordance with the Amendment to Lessor's Consent, Debtor assigned its right, title and interest in a certificate of deposit (the "Certificate of Deposit") in the amount of $270,000 to Riviera as a security deposit (the "Additional Security Deposit").

By letter to City National Bank dated June 13, 1991, Riviera notified City National Bank of the assignment of the Certificate of Deposit and thereby perfected its security interest in the Certificate of Deposit.

Debtor paid rent until September 1992, when it paid only a portion of the rent due that month, and paid no rent thereafter.

Riviera asserts that Riviera and its counsel have at all times acted in good faith and without knowledge that any of its actions violated any legal requirement. Charter has to date adduced no evidence to dispute this assertion, except for a September 24, 1993 letter from the Committee, which Charter contends puts Riviera on notice that its actions had contradicted legal requirements.

On October 15, 1992, Riviera sent a letter addressed to Debtor, with copies to Charter Hospital and Charter Medical, wherein Riviera declared the following defaults under the Lease and demanded the defaults be "corrected":

(a) The failure to pay $12,000.00 of rental payments due on September 1, 1992, pursuant to paragraph 4(A)(6) of the Lease;

(b) the failure to pay monthly rent of $42,000.00 due on October 1, 1992, pursuant to paragraph 4(A)(6) of the Lease;

(c) the failure to pay $4,200.00, the agreed late charge, equal to 10% of the total rent, for failure to pay rent due September 1, 1992, on or before September 6, 1992, pursuant to paragraph 4(G) of the Lease;

(d) the failure to pay $4,200.00, the agreed late charge, equal to 10% of the total rent, for failure to pay rent due October 1, 1992, on or before October 6, 1992, pursuant to paragraph 4(G) of the Lease;

(e) the failure to pay $35,000.00, representing attorneys' fees incurred by Land-

lord in connection with its review and preparation of documents related to the Assignment of the Lease by Charter Hospital of Torrance, Inc., to South Bay Medical Center, Inc., and South Bay Medical Associates, pursuant to paragraph 13(C)(7) of the Lease.

A true and correct copy of this October 15, 1992 letter was attached to the Riviera Motion as Exhibit "I".

By letter dated October 28, 1992, Charter Hospital directed Riviera, in accordance with paragraph 4 of the Amendment to Lessor's Consent, to apply the Additional Security Deposit of $270,000 to the amounts due and to provide an accounting. A true and correct copy of this October 28, 1992 letter is attached to the Riviera Motion as exhibit "J".

Charter asserts that the Debtor remained in possession of the premises that are the subject of the Lease until on or about October 31, 1991. This Chapter 11 case was commenced on November 2, 1992, by the filing of an involuntary Charter 7 petition.

By letter dated November 9, 1992, addressed to Charter Medical with copies to Charter Hospital and Debtor, Riviera stated, inter alia, the following:

> You were previously advised in writing of the fact that rent due under the Lease had not been paid for the months of September and October, 1992. . . .
>
> In response, you requested that the outstanding payments due under the Lease be paid out of the $270,000 that Riviera has on deposit to secure performance of the obligations of the Lessee under the Lease. This letter confirms that the rental payments due for September, October and November, 1992, the late payments for rent due in August 2, September and October, 1992, and the outstanding attorneys' fees have been deducted from these sums on deposit. No late fee was deducted for the payment due November 1, 1992.
>
> Accordingly, rental payments due monthly through November 30, 1992, as well as other payments of money described in my previous letter, have been paid.

A true and correct copy of the November 9, 1992 letter is attached to the Riviera Motion as Exhibit "K".

In a letter dated November 19, 1992, addressed to Riviera's counsel, Charter's counsel stated, among other things:

> . . . If and when sums are in fact owing for utilities, you are hereby directed, pursuant to Section 4 of Amendment No. 1 to Consent of Lessor, to pay all such amounts prior to delinquency from the $270,000 provided by SBMA, and to provide a proper accounting of all such payments.

A true and correct copy of the November 19, 1992 letter was attached to the Riviera Motion as Exhibit "L". Charter contends that, at the time that it wrote this letter, it had no knowledge of the bankruptcy filing of debtor.

On December 1, 1992, an order for relief was entered and the case was converted to a case under Chapter 11 of the Bankruptcy Code.

By letter dated December 3, 1992, addressed to Charter Medical, with copies to Charter Hospital and South Bay, Riviera stated, among other things:

> . . . [A]ll rental payments through November 30, 1992 were paid out of the security deposit funds currently held by Riviera. Similarly, the rental payment due December 1, 1992, covering the rent through December 31, 1992, has since been withdrawn from such security deposit funds.
>
> The attorneys' fees incurred in connection with these breaches have not as yet been paid out of such security deposit funds. When the amounts have been ascertained, they will also be withdrawn.

A true and correct copy of the December 3, 1992 letter was attached to the Riviera Motion as Exhibit "M".

On or about January 4, 1993, the Court issued a "Notice of Commencement of Case under Chapter 11 of the Bankruptcy Code" in the above-referenced proceeding. Riviera contends that this notice was received by Riviera on or about January 14, 1993 and that it was the first notice that Riviera received of the Debtor's bankruptcy proceeding.

By letter dated January 28, 1993, addressed to Charter Medical with copies to Charter Hospital and South Bay, Riviera stated, among other things:

> ... [O]f the total security deposit ... Riviera has deducted ... a total of $235,913. Accordingly, there remains $42,483 in the security deposit account left by SBMC/SBMA, or $483 more than is required to pay the monthly rental payment of $42,000.00 due February 1, 1993.
>
> Please advise Charter that the rental payment for February will be paid out of the security deposit account, but that the rental payment for March must be made, in full, when it is due, and since there is only $483 available in the security deposit toward the March rental payment. The shortfall for March ($41,517), and the payments due in April and thereafter must be made by Charter directly to Riviera. In that way, a late rental charge for March and for future months, can be avoided.

A true and correct copy of the January 28, 1993 letter was attached to the Riviera Motion as Exhibit "O".

Riviera contends that it applied $235,913 of the Additional Security Deposit before it had received notice of the instant bankruptcy proceeding, and applied $42,483 after it received such notice.

Charter commenced paying rent on the Lease in March 1993, after the Additional Security Deposit was exhausted, and has paid rent currently thereafter through December 1994.

In late September 1993, Riviera received a letter dated September 24, 1993, from the Committee regarding the pre-petition payments that the Committee claimed were preferences, and the post-petition application of the Additional Security Deposit, which the Committee sought to have re-paid to the Debtor.

After having received the Committee's letter, Riviera attempted by telephone to seek direction from Charter regarding how to proceed or respond to the Committee's demands. Riviera asked Charter whether Riviera should return the moneys described in the Committee's letter, and Riviera notified Charter that Riviera would be willing to return the moneys if Charter would reimburse Riviera for the funds that Riviera would be paying, in accordance with what Riviera believed were Charter's obligations under the Lease, Guaranty and assignment documents. Charter did not respond to these suggestions or inquiries or give any directions.

Riviera also wrote a letter dated October 14, 1993 to Charter concerning the Committee's demand and inquiring as to how Charter intended to proceed.

On or about February 24, 1993, the Committee commenced the instant adversary proceeding by filing a complaint against Riviera. The complaint consisted of four claims for relief: a claim for avoidance and recovery of allegedly preferential transfers (payments of $70,000 under the Lease that had been received by Riviera within 90 days before the bankruptcy petition was filed); a claim for turnover of estate property (payments under the Lease that Riviera had received by application of the Additional Security Deposit after the bankruptcy petition had been filed); a claim for avoidance and recovery of post-petition transfers; and a claim for penalties for contempt of court for willful violation of the automatic stay.

By letter dated March 8, 1994, addressed to Charter's counsel, Riviera's counsel stated, among other things:

> Riviera hereby demands the following:
>
> 1. That Charter forthwith indemnify and defend Riviera in the above-referenced action, pursuant to section paragraph 17 of the Amended and Restated Hospital Lease;
>
> 2. That Charter make payment to Riviera in accordance with the Guaranty dated August 1, 1986 of all sums sought in the above-referenced action;
>
> 3. That Charter notify the unsecured creditors committee in writing that Charter will assume any and all obligations for payment of the sums sought in the above-referenced action;
>
> 4. That Charter pay all of Riviera's fees and expenses in handling and responding to the above-referenced action.

A true and correct copy of the March 8, 1994 letter was attached to the Riviera Motion as Exhibit "Q".

By letter dated March 16, 1994, addressed to Riviera's counsel, Charter's counsel stated (among other things):

> Based upon our analysis of the claims for relief alleged in the complaint that commenced the above adversary proceeding (the "Adversary Proceeding") and our review of the indemnification provisions referenced in your letter of March 8, 1994, we do not believe that Charter has a duty to defend or indemnify your client, Riviera Medical Development Company ("Riviera"), in connection with the Adversary Proceeding. The indemnification obligations imposed by paragraph 17 of the Amended and Restated Lease (the "Lease") are fairly narrow in scope and cannot be read to include a duty to defend or indemnify Riviera with regard to a preference action or a claim based upon an alleged willful violation of the automatic stay. Moreover, with regard to a claim of the latter variety, even if the Lease had been drafted to include a duty to indemnify Riviera, we doubt that such a provision would be enforceable as a matter of public policy.
>
> . . . .
>
> In addition, as I mentioned in our telephone conversation of this afternoon, there may well be a variety of defenses available to Riviera in the Adversary Proceeding. If for any reason Riviera fails to competently and aggressively pursue any and all such defenses, such failure will exonerate Charter from any liability that it would otherwise have had to indemnify Riviera against losses that it may incur in the Adversary Proceeding.

A true and correct copy of the March 16, 1994 letter was attached to the Riviera Motion as Exhibit "S".

On April 11, 1994, Riviera filed a motion for summary judgment or summary adjudication of defenses with regard to the Committee's claims against Riviera.

On April 20, 1994, Riviera filed its answer to the Committee's complaint and a counterclaim/third party complaint (the "Third Party Complaint"). In the first claim for relief of the Third Party Complaint, Riviera sought a declaration that it is entitled to recover from Charter, under the Lease, the Guaranty, and the provisions of the assignment documents that Riviera contend provide that Charter remained primarily liable under the Lease and the Guaranty, amounts found due and owing to the Committee in the main action. In the second claim for relief, Riviera sought damages from Charter Medical for alleged breach of the Guaranty. In the third claim for relief, Riviera sought indemnification for any amounts for which it was found liable to the Committee and for the attorneys' fees incurred in defending the adversary action and bringing its third party complaint. In the fourth claim for relief, Riviera sought specific performance of the Lease, relating to provisions as to how the property must be operated. (This latter claim is not involved in the Riviera Motion.) And in the fifth claim for relief, Riviera sought damages for breach of the Lease.

On or about June 9, 1994, the Committee filed a motion for summary judgment or partial summary judgment on its claims in the main action.

The Committee's and Riviera's cross-motions in the main action were heard by the Court on August 25, 1994. The Court made the following rulings in response to these motions:

> A. that the $42,000 paid by the Debtor for the August, 1992 rent may be avoided under Bankruptcy Code § 547(b);
>
> B. that Riviera is entitled to assert an affirmative defense under Bankruptcy Code § 547(c)(1) to prevent the avoidance of the $42,000 in rent paid by the Debtor for the month of September, 1992;
>
> C. that Riviera is entitled to assert an affirmative defense under Bankruptcy Code § 547(c)(4) in the amount of an additional $42,000 based on the fact that the Debtor occupied the premises that are the subject of the Lease during the month of October, 1992 and failed to make payment to Riviera therefor;
>
> D. that Riviera and Charter are not allowed to assert an administrative claim

under Bankruptcy Code § 365(d)(3) for amounts that fell due under the Lease during the first 60 days of the Debtor's bankruptcy case;

E. that Riviera applied the Additional Security Deposit to amounts that it contends were due under the Lease in violation of the automatic stay and must disgorge the amounts so applied, which amounts, when returned, will remain subject to the duly-perfected liens asserted by Riviera and Charter; and

F. that the Committee is entitled to an award of sanctions as against Riviera for its violations of the automatic stay in an amount to be determined by the Court.

Charter prepared, and Riviera and Charter jointly filed on or about August 23, 1994, a motion for relief from the automatic stay, to permit Riviera to apply the Additional Security Deposit to amounts due under the Lease. No opposition to the motion was filed. The Court granted this motion by order entered on September 23, 1994.

At all times relevant herein from the time the Committee demanded that Riviera return the Additional Security Deposit, Riviera has asserted that it would return the amounts that it applied from the Additional Security Deposit toward rent and other amounts that Riviera contends were due under the Lease, if Charter paid to Riviera all amounts to be returned.

At all times relevant herein from the time the Committee demanded that Riviera return the Additional Security Deposit, Charter has asserted that Riviera was entitled to assert various affirmative defenses to the claims alleged in the main action and refused to reimburse Riviera for amounts that Riviera applied from the Additional Security Deposit. Charter contends that it refused to give Riviera $270,000 to return to the Committee because Riviera held a duly-perfected security interest in the Security Deposit and would therefore be able to apply the full amount of the Security Deposit against amounts due under the Lease once it obtained relief from the automatic stay to permit it to do so. Riviera does not concede that this is why Charter refused to give Riviera $270,000 to return to the Committee.

Riviera filed the instant motion on September 23, 1994.

Riviera, Charter and the Committee settled the Committee's claims, by a proposed agreement read into the record on January 19, 1995. Pursuant to that agreement, Charter agreed to pay $21,000 to the Committee in settlement of all preference claims, Riviera agreed to pay $35,000 to the Committee in settlement of all claims for penalties relating to the claim for violation of the automatic stay, and Riviera and Charter agreed that all claims by and between them would be reserved and that nothing in the agreement would constitute an admission of liability.

To the extent, if any, that Charter Hospital is found liable to Riviera in this adversary proceeding, Charter Medical is also obligated under the terms of the Guaranty.

### PROCEDURAL STIPULATION

Riviera and Charter have agreed to submit this motion to the Court on these stipulated facts, and further have agreed that the claims regarding operation of the property as a hospital shall be dismissed without prejudice and that any applicable statutes of limitations shall have been tolled during the pendency of this adversary action.

The issue of the amount of any damages recoverable on the indemnification claims asserted in the third party complaint shall be submitted to the Court upon resolution of the issues presented by this motion.

### ISSUES OF LAW TO BE DETERMINED

Subject to the approval of the settlement described above, the Court must determine the following issues of law in connection with the instant motion:

A. Is Charter liable to Riviera under paragraph 17 of the Lease for all or any portion of Riviera's attorneys' fees and costs in defending against the complaint filed by the Committee in this adversary proceeding?

B. Is Charter liable to Riviera under paragraph 17 of the Lease for all or any portion of Riviera's attorneys' fees and costs incurred in bringing and pursuing the Third Party Complaint?

C. Is Charter liable to Riviera under paragraph 17 of the Lease for all or any portion of the amounts that Riviera will pay to the Committee in settlement of its claim for violation of the automatic stay?

## II. DISCUSSION

*I. Jurisdiction*

■ The Court finds that the parties have consented to the Court's jurisdiction and the entry of final judgments and orders in this action. The Court has supplemental jurisdiction over Riviera's cross-complaint as an ancillary matter to the Committee's action. *In re Davis,* 177 B.R. 907, 911–912 (9th Cir. BAP 1995); *Wieboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162, 166 (N.D.Ill.1990); *In re W.J. Services, Inc.,* 139 B.R. 824, 826 (Bankr.S.D.Tex.1992); *Hawkins v. Eads (In re Eads),* 135 B.R. 387, 390 (Bankr.E.D.Cal. 1991); *In re Feifer Industries,* 141 B.R. 450, 452 (Bankr.N.D.Ga.1991); *In re ICS Cybernetics, Inc.,* 123 B.R. 467, 472 (Bankr. N.D.N.Y.1989); *In re Aerni,* 86 B.R. 203, 207 (Bankr.D.Neb.1988); *In re Petrolia Corporation,* 79 B.R. 686, 689–692 (Bankr.E.D.Mich. 1987); *In re Tidewater Group, Inc.,* 63 B.R. 670, 673 (Bankr.N.D.Ga.1986); *In re Coral Petroleum, Inc.,* 62 B.R. 699, 703–704 (Bankr.S.D.Tex.1986); *In re John Peterson Motors, Inc.,* 56 B.R. 588, 590–592 (Bankr. D.Minn.1986); *In re Wood,* 52 B.R. 513, 522–524 (Bankr.N.D.Ala.1985). The Fifth Circuit Court of Appeals has recently held to the contrary, *In re Walker,* 51 F.3d 562, 569–573 (5th Cir.1995) (bankruptcy court cannot exercise supplemental jurisdiction over third party claim).

*II. Riviera's violation of the automatic stay*

The Court has previously ruled that Riviera violated the automatic stay. Riviera contends that Riviera and its counsel have at all times acted in good faith and without knowledge that any of its actions violated any legal requirement. This contention is irrelevant because Riviera's actions were sufficient to justify the prior ruling. *In re Knaus,* 889 F.2d 773, 775 (8th Cir.1989) (failure of a creditor to turn over property of the estate constituted a prohibited attempt to exercise control over property of the estate in violation of the automatic stay) *cited with approval in In re Abrams,* 127 B.R. 239, 242 (9th Cir. BAP 1991).

■ Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded. *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989). "Allowing ignorance of the law or 'good faith' to be a defense to monetary penalties for stay violation will only encourage ignorance, real or feigned. Encouragement of ignorance is not the message that bankruptcy judges should be sending to creditors in their § 362(h) decisions. The effect of interpretations which encourage ignorance will only serve to encourage stay violations and stir up litigation." *In re McLaughlin,* 96 B.R. 554, 560 (Bankr.E.D.Pa.1989).

Riviera has attempted to shift the blame for the violation of the automatic stay because Charter had demanded that Riviera "aggressively pursue any and all defenses" to the Committee's adversary action. In *In re Sansone,* 99 B.R. 981 (Bankr.C.D.Cal.1989), the creditor filed two cross-complaints against the debtor in state court without obtaining relief from stay. The debtor filed an action against the creditor seeking damages for violation of the stay. The creditor contended, inter alia, that the filings of the cross complaints were necessary because they were compulsory cross-complaints. The court stated:

> [B]oth state law and the Bankruptcy Code provided them with procedures to test their question without first violating the stay. Prior to the filing of the cross-complaints [creditor's attorney] could have (1) sought a state court extension of time to file his "compulsory" pleadings based upon his doubt as to the applicability of § 362(a), and/or (2) sought relief from stay from the bankruptcy court. [Creditor's attorney] did neither of these things.

*Id.* at 986. *See also In re Randy Homes Corp.,* 84 B.R. 799, 801 (Bankr.M.D.Fla. 1988). Here, Riviera had the option of either turning over the security deposit to the es-

tate or promptly seeking relief from stay. As in *Sansone,* Riviera did neither.

### III. Is Charter liable to indemnify Riviera for the sanction imposed for Riviera's violation of the automatic stay?

The Court has been unable to locate any case law concerning indemnification clauses and the imposition of sanctions for § 362 violations. However, there is authority regarding indemnification of sanctions imposed under Rule 11 of the Federal Rules of Civil Procedure.

In *Derechin v. State University of New York,* 963 F.2d 513 (2d Cir.1992), Killeen was a New York assistant attorney general. The District Court imposed sanctions against Killeen under Rule 11 and prohibited her from receiving indemnification normally available under N.Y. Public Officers Law § 17. The Second Circuit Court of Appeals held that the District Court may impose Rule 11 sanctions without the possibility of reimbursement.

> The Supreme Court's recent teachings on Rule 11 suggest that the same policy considerations that have persuaded many states to prohibit the insurability of punitive damages as a matter of public policy apply in the context of Rule 11. Eighteen states, including New York, have held that insurance policies covering punitive damages assessed directly on the defendant are void as a matter of public policy.
>
> . . . .
>
> The availability of insurance for Rule 11 sanctions might increase the possibility for full recovery of attorney's fees, but would weaken the deterrent effect of the sanction by allowing the sanctioned attorney to shift the burden of the sanction. Deterrence would be undermined if district courts could not impose Rule 11 sanctions without the possibility of indemnity—whether from a client, an employer, or an insurer. We therefore hold that a district court may, within its sound discretion, impose Rule 11 sanctions on an attorney without the possibility of reimbursement from any source, including insurance and employer indemnification.

*Id.* at 518–519 (citations omitted). *See also Cartel Capital Corporation v. Fireco of New Jersey,* 81 N.J. 548, 566, 410 A.2d 674, 683 (1980) (indemnity may not ordinarily be obtained by a party who has been at fault).

In *Harb v. Gallagher,* 131 F.R.D. 381 (S.D.N.Y.1990), Ranni, an attorney, was sanctioned under Rule 11 based on the filing of an action that was barred by res judicata. The mother of Ranni's client had agreed to indemnify Ranni for any sanctions awarded against him by the Court under Rule 11. The District Court held that "any purported indemnification agreement between the plaintiffs is declared illegal and unenforceable, as violative of the spirit, intent and purposes of Rule 11, Fed.R.Civ.P." The District Court adopted the Report and Recommendations of Magistrate Tyler which stated:

> That an attorney would attempt to avoid the strictures of Rule 11 and our professional Code of Ethics by either extracting a promise from a client or a relative of the client to absorb the consequences of an improper filing, or agreeing to do so even at the unsolicited suggestion of such client or relative, when, as here, the attorney knows or should have reason to know that such filing violates Rule 11 or is otherwise improper, offends deeply and should not be countenanced. Thus, any order or judgment to be entered herein should specifically declare such indemnification agreement illegal and violative of the spirit, intent and purposes of Rule 11, Fed.R.Civ. P., and that such agreement should not be enforced in any respect, whatsoever.

*Id.* at 390. *See also Borowski v. DePuy, Inc.,* 850 F.2d 297, 305 (7th Cir.1988) (sanctions should be borne by counsel alone, without reimbursement by client, when sanction imposed for inappropriate choice of legal argument).

In *Bar Plan v. Campbell,* 1991 WL 179443 (Mo.App.1991), Campbell, an attorney, was sanctioned by the District Court under Rule 11 based upon the filing of a complaint drafted, signed and filed by Campbell. Campbell sought to have the sanctions covered by a legal malpractice policy issued by the Bar Plan, an organization created by the Missouri bar to provide malpractice insurance for

members of the Missouri Bar. In his dissent, Judge Carl Gaertner stated:

> The purposes of Rule 11 sanctions are identical to the purposes of punitive damages in cases of intentional tort or outrageous conduct; to punish the wrongdoer and deter others from like conduct. Such purposes would be frustrated if the wrongdoer is permitted to insure himself against the consequences of his personal misconduct. For this reason it is contrary to the public policy of Missouri to permit the shifting of the burden of punitive damages assessed for personal misconduct, be it intentional tortious conduct or reckless indifference to the safety of others, to an insurer. *Crull v. Gleb,* 382 S.W.2d 17, 23 (Mo.App.1964).

*Id.* at *7 (Gaertner, C., dissenting).

■ The cases cited above which deny indemnification for Rule 11 violations are persuasive here because the policy considerations behind the imposition of sanctions are similar, that is, to deter violations. "The policy behind section 362(h) is self-evident; it is intended to discourage violations of the automatic stay." *In re Putnam,* 167 B.R. 737, 741 (Bankr.D.N.H.1994). *See also In re McLaughlin,* 96 B.R. 554, 560 (Bankr. E.D.Pa.1989) (the purpose of § 362(h) is to clarify and broaden the powers of bankruptcy judges to impose sanctions and thereby discourage violations of the automatic stay). Therefore, the Court holds that Charter is not liable to Riviera under paragraph 17 of the Lease for any portion of the amounts that Riviera will pay to the Committee in settlement of its claim for violation of the automatic stay.

*IV. The Bankruptcy Code does not create any right to indemnification or contribution.*

Outside of the provisions of the Lease, the Bankruptcy Code does not provide for a right to indemnification or contribution. *See In re Walker,* 51 F.3d 562, 565–567 (5th Cir.1995); *Wieboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162, 167 (N.D.Ill.1990); *In re Pearson Industries,* 142 B.R. 831, 848 (Bankr.C.D.Ill.1992); *In re John Peterson Motors, Inc.,* 56 B.R. 588, 591 n. 5 (Bankr.

D.Minn.1986); Edward M. Fox & James Gadsden, *Rights of Indemnification and Contribution among Persons Liable for Fraudulent Conveyances,* 23 Seton Hall L.Rev. 1600 (1993). A creditor sanctioned for violation of the automatic stay has no right of contribution from a third party. *In re Walker,* supra. In *Walker,* the debtor owed a mobile home which was pledged as collateral to Cadle. Cadle obtained a default judgment against the debtor. The debtor subsequently filed bankruptcy. Cadle unsuccessfully sought to have the debtor execute a voluntary surrender form. Cadle sold the trailer to Davis. Svara (Davis' fiance') and some associates removed the trailer which appeared abandoned, throwing the debtor's personal property out onto the lot. In fact, the debtor had been hospitalized for pneumonia and heart failure for approximately two weeks. The debtor's personal property was unsalvageable due to exposure to the elements. The debtor filed an adversary action against Cadle for violation of the automatic stay. Cadle brought a third party demand against its attorney and Svara seeking contribution and/or indemnity for any damages assessed against Cadle. Judgment was entered against Cadle for violation of the automatic stay. The Fifth Circuit held that there was no cause of action for contribution under § 362. The *Walker* court stated a "right of contribution may arise in either of two ways: first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or, second, through the power of federal courts to fashion a federal common law of contribution." *Id.* at 566 (quoting *Texas Indus. v. Radcliff Materials,* 451 U.S. 630, 638, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981)). The *Walker* court held that there is no express right to contribution in § 362 and that there is no legislative history indicating a congressional intent to create a cause of action for contribution. There is nothing in the legislative history of § 362 or in the case law interpreting that history to indicate that § 362(h) is designed to protect creditors who ignore the automatic stay. *Id.* at 566.

The *Walker* court concluded that no such right to contribution exists through federal

common law. The Supreme Court has cautioned the courts to invoke the power of the "federal common law" only when either "a federal rule of decision is necessary to protect uniquely federal interests, [or] ... Congress has given the courts the power to develop substantive law." *Walker*, 51 F.3d at 567 (quoting *Texas Indus., supra*, 451 U.S. at 640, 101 S.Ct. at 2066). Accordingly, the Fifth Circuit refused to fashion a new remedy that might disturb the Bankruptcy Code's "carefully considered legislative scheme." *Walker*, 51 F.3d at 567 (quoting *Wieboldt Stores*, 111 B.R. at 168).

### V. Is Charter liable for Riviera's attorneys' fees in defending against the Committee's action?

Paragraph 17 of the Lease sets forth the circumstances under which Charter is required to indemnify Riviera. The Committee's action sought to avoid preferential transfers and to recover damages for violation of the automatic stay. Addressing each of the subparagraphs under paragraph 17: first, the Committee's action would not fall under the circumstances delineated in subparagraph (A) in that the action does not involve an "accident, injury to or death of persons (including workers) or loss of or damage to property...." Similarly, the Committee's action does not involve subsection (B), "[a]ny use, non-use or condition of the Property ... or the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways...." Further, the action does not involve subparagraph (D) regarding "[p]erformance of any labor or services or the furnishing of any materials...."

■ Subparagraph "C" addresses: "Any failure of the part of Lessee to perform or comply with any of the terms of this Lease." In analyzing subparagraph "C", the case law concerning attorneys' fee clauses are persuasive. In the context of attorneys' fees clauses, a preference action is not an action to enforce the contract which would trigger an attorneys' fee clause. In *In re LCO Enterprises, Inc.*, 180 B.R. 567 (9th Cir. BAP 1995), the chapter 11 trustee filed a preference action against the debtor's lessor. Judgment was entered in favor of the lessor.

The lessor filed a motion for attorneys' fees. The Bankruptcy Appellate Panel held:

> ... While it may be true that attorneys' fees are recoverable if they are linked to litigation seeking to enforce a contract, these fees were not so incurred. "[W]hile both contracts provided for attorneys' fees, this action was not one for the enforcement of the contracts." This litigation was based wholly in bankruptcy law, as preferential transfers are not avoidable outside the bankruptcy context in the same way that they can be recovered under 11 U.S.C. § 547.
>
> ....
>
> ... The flaw in [the lessor's] reasoning is their failure to recognize the difference between litigation based upon the contract and litigation which is not based upon the contract. The asserted rationale for recovery of the pre-petition payments was unique to bankruptcy.... [T]his recovery was based wholly upon bankruptcy provisions. We, therefore, hold that this was not an action under the contract which gives effect to the attorneys' fees clause in the contract.
>
> ....
>
> ... [T]he § 547 litigation was not the result of [the debtor's] default under the lease, as [the lessor] asserts, but rather was the result of the application of bankruptcy laws to payments made by [the debtor] to [the lessor]. These payments could have been pursued by the trustee whether there was a default under the lease, a payment made on a car purchase agreement, or the payment of a state court judgment. These actions were not pursued solely due to [the debtor's] default.

*Id.* at 570–571 (citation omitted). *See also In re Coast Trading Company, Inc.*, 744 F.2d 686, 693 (9th Cir.1984) (the question of the applicability of the bankruptcy laws to particular contracts is not a question of the enforceability of a contract but rather involves a unique, separate area of federal law).

Here, subparagraph "C" is analogous to an attorneys' fee clause. The Committee's action did not arise from the failure of the Lessee to perform or comply with a term of

**974**

the Lease. Both the preference action and an action to recover damages for violation of the stay existed independently of any failure of the Lessee to comply with the Lease. Therefore, the court holds that Charter is not liable for the attorneys' fees incurred by Riviera in defending against the Committee's action.

VI. *Is Charter liable to Riviera under paragraph 17 of the Lease for all or any portion of Riviera's attorneys' fees and costs incurred in bringing and pursuing the Third Party Complaint?*

In regard to attorneys' fees incurred in bringing Riviera's third party complaint, the issues are largely similar to those raised above in section V. In contrast, Riviera is seeking to enforce the terms of the Lease by way of the third party complaint; however, Charter has not failed "to perform or comply with any of the terms of this Lease...." Therefore, Charter has no duty to indemnify Riviera for any portion of Riviera's attorneys' fees and costs incurred in the third party complaint.

### III. CONCLUSION

Riviera's motion for summary judgement is denied. There are no triable issues of fact, therefore, Charter is entitled to judgment as a matter of Law. Charter's right, if any, to recover attorneys' fees as the prevailing party, shall be determined by subsequent appropriate proceedings. This memorandum of decision contains this Court's findings of fact and conclusions of law. Counsel for Charter shall lodge and serve a proposed order consistent with this memorandum of decision.