**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED MAY 7, 2008

CITY OF DETROIT,

　　　　Plaintiff/Counter-
　　　　Defendant/Appellee,

v　　　　　　　　　　　　　　　　　No. 132329

AMBASSADOR BRIDGE COMPANY,
a/k/a DETROIT INTERNATIONAL
BRIDGE COMPANY,

　　　　Defendant/Counter-
　　　　Plaintiff/Appellant.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

This case presents us with an invitation to second-guess the trial court's factual findings that construction projects on the Ambassador Bridge Plaza would alleviate traffic congestion and facilitate interstate and foreign commerce. Because the trial court, after conducting a four-week bench trial and delivering a 20-page opinion, did not rely on clearly erroneous facts, we decline that invitation. Accordingly, we reverse the judgment of the Court of Appeals because the Detroit International Bridge Company (DIBC) is a federal instrumentality for the limited

purpose of facilitating traffic over the Ambassador Bridge and, as such, is immune from the zoning regulation of the city of Detroit that would preclude construction projects furthering this limited federal purpose.

## I. FACTS AND PROCEDURE

The city of Detroit seeks to enforce its zoning ordinance on the DIBC to stop the DIBC's construction projects located in and around the Ambassador Bridge's footprint.[1] Part of the Ambassador Bridge sits on land owned by the DIBC that is within the city's geographical boundaries. The DIBC is a for-profit, private company that has a unique relationship with the federal government. In 1921, Congress gave the DIBC the authority to construct, maintain, and operate the Ambassador Bridge and its approaches. Ambassador Bridge authorization act, PL 66-395, 41 Stat 1439. This authorizing statute requires that the bridge's private operator (the DIBC) also comply with the Bridge Act of 1906, 33 USC 491 *et seq*. The Bridge Act of 1906 applies to all bridges over navigable waters, and it requires all bridge operators to obtain the approval of the United States Secretary of Transportation regarding the "plans and specifications and the location of such bridge and accessory works" before commencing construction of a new bridge or construction on an old bridge or its accessories. 33 USC 491.

---

[1] The Ambassador Bridge is an international bridge that connects Detroit, Michigan, and Windsor, Ontario. The trial court found that the bridge is the "largest commercial crossing in North America. It carries approximately thirty percent (30%) of more than $1 billion per day in daily trade between the United States and Canada."

2

In late 2000, the DIBC was working with the several federal agencies that operate in and around the bridge to gain approval for the installation of new tollbooths for cars and trucks, a diesel fuel station for its duty-free plaza, and truck weighing stations.[2] The federal agencies initially refused to allow the projects, citing concerns about the projects' plans and locations. Eventually, after making changes suggested by those federal agencies, the DIBC gained the federal government's approval for the projects.[3] Next, the DIBC requested the city's approval to begin construction. The city denied the request, citing its zoning ordinance, and refused to issue variances, citing concerns regarding increased truck exhaust and noise. Nonetheless, the DIBC went forward with its projects. As a result, the city's building inspectors visited the DIBC's construction sites and issued several citations for violations related to the construction.

In February 2001, the city filed an injunctive action against the DIBC to stop the construction. After a four-week bench trial, the trial court orally ruled that the DIBC was immune from the zoning ordinance because of its status as a

---

[2] At that time, the tollbooths were located on the Canadian side of the Ambassador Bridge. With the proposed change, the tollbooths would be located outside the customs holding area on the American side of the bridge. The city voiced concern that this could cause vehicles to back up on the American side after leaving customs but before paying the bridge-use toll.

[3] The federal government implicitly approved the projects in that it initially disapproved the projects, but, after the DIBC adopted its recommendations, the federal government no longer disapproved the projects, and the DIBC then began and completed the construction projects.

federal instrumentality. The trial court planned to prepare a written decision, but, given the events of 9/11 and border security concerns, the court suggested that the parties enter extended negotiations, to which they agreed. After the negotiations failed, the court delivered a written decision in July 2004. The court again ruled that the DIBC was immune from the ordinance as a federal instrumentality. In addition, the trial court held that the city's zoning ordinance was preempted by the federal government's demonstrated intent to control the entire bridge complex.[4]

The city appealed. The Court of Appeals reversed on both grounds. First, relying on *Detroit Int'l Bridge Co v American Seed Co*, 249 Mich 289; 228 NW 791 (1930), and *Int'l Bridge Co v New York*, 254 US 126; 41 S Ct 56; 65 L Ed 176 (1920), the Court of Appeals held that the trial "court's finding that DIBC was constructed for the purpose of facilitating interstate and international commerce is clearly erroneous" and that the DIBC could not be a federal instrumentality. *Detroit Int'l Bridge Co v Detroit*, unpublished opinion per curiam of the Court of Appeals, issued September 14, 2006 (Docket Nos. 257369 and 257415), p 7. The Court of Appeals also held that the city's zoning ordinance was not preempted by federal law because the federal government did not intend to exercise exclusive control over the bridge. *Id*. at 11-12.

---

[4] In the interim, the projects were completed in August 2001.

## II. STANDARD OF REVIEW

This case involves an issue of federal preemption of state law and local regulation, which involves statutory interpretation. *Philadelphia v New Jersey*, 430 US 141, 142; 97 S Ct 987; 51 L Ed 2d 224 (1977). Statutory interpretation is a question of law, which we review de novo. *In re Investigation of March 1999 Riots in East Lansing*, 463 Mich 378, 383; 617 NW2d 310 (2000). In addition, we review the trial court's factual findings that support its legal holdings for clear error. MCR 2.613(C); *Sands Appliance Services, Inc v Wilson*, 463 Mich 231, 238; 615 NW2d 241 (2000). A trial court's factual findings are clearly erroneous only when the reviewing court is "'left with the definite and firm conviction that a mistake has been made.'" *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (citation omitted).

## III. ANALYSIS

"The doctrine of federal preemption has its origin in the Supremacy Clause of article VI, cl 2, of the United States Constitution, which declares that the laws of the United States 'shall be the supreme Law of the Land . . . .'" *Ryan v Brunswick Corp*, 454 Mich 20, 27; 557 NW2d 541 (1997), abrogated in part on other grounds by *Sprietsma v Mercury Marine*, 537 US 51 (2002). Preemption occurs "when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wisconsin Pub Intervenor v Mortier*, 501 US 597, 605; 111 S Ct 2476; 115 L Ed 2d 532 (1991) (citations omitted). Preemption can occur when a state law or local regulation

5

prevents a private entity from carrying out a federal function that Congress has tasked it with performing. See *Hancock v Train*, 426 US 167, 178-179; 96 S Ct 2006; 48 L Ed 2d 555 (1976), citing *Johnson v Maryland*, 254 US 51, 57; 41 S Ct 16; 65 L Ed 126 (1920). A private actor takes on the title of "federal instrumentality" when acting in furtherance of the applicable federal function. *Union Joint Stock Land Bank of Detroit v Kissane*, 277 Mich 668, 670; 270 NW 178 (1936); *Mount Olivet Cemetery Ass'n v Salt Lake City*, 164 F3d 480, 486 (CA 10, 1998); *Fed Land Bank of Wichita v Kiowa Co Bd of Comm'rs*, 368 US 146, 149, 151; 82 S Ct 282; 7 L Ed 2d 199 (1961). Thus, federal instrumentality status can be limited to apply only when the private actor is acting in furtherance of the federal purpose that made it a federal instrumentality. See *Kissane*, 277 Mich at 669-672 (accepting that a federally chartered bank was a federal instrumentality, but holding that the bank was not immune from a state law that did not affect its federal purpose). Furthermore, being a "federal instrumentality" is not an all-or-nothing status; a private actor may be a federal instrumentality for one set of actions, while not being a federal instrumentality during a separate set of actions. *Mendrala v Crown Mortgage Co*, 955 F2d 1132, 1139 (CA 7, 1992) (noting that because a private actor is not a federal instrumentality for one purpose "does not preclude a determination that it is a federal instrumentality for other purposes").

We refer to part-time federal actors as limited federal instrumentalities because they are only immune from state laws and local regulations when they are acting in furtherance of the limited federal purpose that served as the impetus for

6

granting them federal-instrumentality status. Also, "[d]esignating an entity a federal instrumentality colors the typical preemption analysis by requiring the court to presume, in the absence of clear and unambiguous congressional authorization to the contrary, that Congress intended to preempt state or local regulation of the federal instrumentality." *Mount Olivet,* 164 F3d at 486, citing *Don't Tear It Down, Inc v Pennsylvania Avenue Dev Corp*, 206 US App DC 122, 129-130; 642 F2d 527 (1980); see also *Hancock v Train*, 426 US at 167, 178-179; *Mayo v United States*, 319 US 441, 446–448; 63 S Ct 1137; 87 L Ed 1504 (1943). And, in this case, there is no such congressional authorization of local regulation. However, despite the presumption noted above, a limited federal instrumentality is immune from state and local regulation only when (1) its actions are within the scope of the federal purpose Congress has assigned to it and (2) the state law or local regulation, if applied, would sufficiently restrict the private entity's federal purpose. See *James v Fed Reserve Bank of New York*, 471 F Supp 2d 226, 242 (ED NY, 2007).

In this case, the trial court primarily relied on federal-instrumentality preemption in holding that the DIBC was immune from the city's zoning ordinance. Indeed, the trial court found that the DIBC was a federal instrumentality for the limited purpose of facilitating traffic across the Ambassador Bridge, which supports the federal purpose of free-flowing interstate and foreign commerce.

7

Accordingly, we must first decide whether the DIBC is a limited federal instrumentality. On that issue, the United States Supreme Court has stated that "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consistency.'" *Lebron v Nat'l Railroad Passenger Corp*, 513 US 374, 378; 115 S Ct 961; 130 L Ed 2d 902 (1995) (citations omitted). Thus, there is no bright-line rule for determining if a private actor is a federal instrumentality. *Mount Olivet*, 164 F3d at 486. As a result, courts have applied numerous tests in determining federal-instrumentality status. *Id*. For example, in *United States v Michigan*, 851 F2d 803, 806 (CA 6, 1988), the court considered three factors: (1) the function for which the private actor claiming immunity was established, (2) whether that private actor continues to serve that function, and (3) the significance of the federal control exerted on, and the federal involvement with, the private actor. This is one example of the factor-based approach to the federal-instrumentality analysis.

In addition, some federal courts have applied a variation of the *United States v Michigan* test when the private entity is only claiming to be a limited federal instrumentality. For example, the court in *Name.Space, Inc v Network Solutions, Inc*, 202 F3d 573, 581-582 (CA 2, 2000), differentiated between "conduct-based immunity" and "status-based" immunity in evaluating the federal-instrumentality status of a private entity that was operating under a contract with a government agency. While evaluating the entity's immunity from a Sherman Act antitrust suit, the court in *Name.Space* noted that a federal instrumentality has

8

status-based immunity, which is absolute immunity, when "the federal government or its agencies directly own and/or exercise plenary control over the [private] entity . . . ." *Id.* at 581. And, alternatively, a limited federal instrumentality has immunity that is less than absolute under a "conduct-based instrumentality doctrine." *Id.*, citing *Southern Motor Carriers Rate Conference, Inc v United States*, 471 US 48, 58-59; 105 S Ct 1721; 85 L Ed 2d 36 (1985). The court in *Name.Space* held that such limited conduct-based immunity could be evaluated by "looking to the 'nature of the activity challenged, rather than the identity of the defendant' . . . ." *Name.Space,* 202 F3d at 581, citing *Southern Motor Carriers,* 471 US at 58-59. Finally, the court gave the private entity federal-instrumentality immunity that was limited to its acts that were required under its contract with the government agency. *Name.Space,* 202 F3d at 582.

We acknowledge that the court in *Name.Space* was dealing with the slightly different issue of governmental immunity from antitrust suits. Further, courts that have analyzed the general federal-instrumentality issue have used several variations of the factors used by the court in *United States v Michigan*, and additional factors in some instances.[5] The essential question to be answered in this case is: Did Congress intend to give the private actor the limited authority to carry

---

[5] See *Mendrala*, 955 F2d at 1136 (CA 7, 1992) (reviewing these factors: "(1) the federal government's ownership interest in the entity; (2) federal government control over the entity's activities; (3) the entity's structure; (4) government involvement in the entity's finances; and (5) the entity's function or mission").

out a unique federal purpose such that the private actor is immune from state or local regulation when it is carrying out that purpose? Because we are convinced that applying the factors from *United States v Michigan* in conjunction with the "conduct-based" analysis used by the court in *Name.Space* will answer this question, we believe that it is the correct analysis for the unique facts of the present case involving a claim of limited federal-instrumentality immunity based on the Supremacy Clause.

As a preliminary matter, we note that this case involves the long-recognized federal purpose of free-flowing interstate and foreign commerce. The Ambassador Bridge is distinctly related to that federal purpose, given that it is a conduit of transportation, and thus commerce, between Canada and the United States. This is not disputed by the parties and was accepted by both lower courts. The dispute in this case concerns whether the DIBC has been tasked to further that federal purpose to the extent necessary for it to be recognized as a limited federal instrumentality. That question initiates the hybrid test discussed earlier.

First, when we apply the test from *United States v Michigan*, it becomes clear that the trial court understood this issue as being laden with pivotal factual disputes in its description of the case as "unique" on its facts. With that understanding, the trial court dutifully conducted a four-week trial. The facts were hotly contested at trial. Indeed, both parties produced numerous witnesses and voluminous evidence to support their claims, and each vigorously cross-examined its opponent's witnesses and evidence. As a result, the court issued a thorough,

20-page opinion that relied heavily on its factual findings. The trial court made several important findings of fact regarding the bridge's operation and its surrounding property:

(1) In 2000, approximately 3.5 million trucks and 9 million passenger cars crossed the bridge.

(2) The bridge complex is an enclosed area separated from its surroundings by fences, brick walls, and barbed wire.

(3) The DIBC, under federal supervision, controls all of the few entrance and exit points to the complex.

(4) The DIBC and the federal government each owns property within the bridge complex.

(5) Several federal agencies share control over the bridge complex: United States Customs and Border Protection, United States Immigration and Customs Enforcement, the General Services Administration, and the Department of Agriculture.

(6) The federal government has plenary control over the bridge complex: "[I]f it is in the compound, it is under federal control." Trial court opinion, p 9.

(7) All DIBC personnel are under federal government control. They must report to the government before leaving the complex.

(8) Federal employees at the bridge complex are charged with enforcing federal laws, maintaining border security, controlling immigration, and conducting

11

customs missions. They have no responsibility for regulating or facilitating traffic flow over the bridge.

(9) The DIBC is solely responsible for regulating and facilitating traffic flow over the bridge.

The trial court also made several findings of fact regarding the DIBC's proposed construction projects and their effect on bridge traffic:

(1) The DIBC had proposed three construction projects: (a) new toll booths for cars, (b) changes in the location and number of diesel pumps, and (c) new tollbooths for trucks.

(2) Traffic delays due to backups on the bridge were a serious problem to the steady flow of traffic across the bridge.

(3) Commercial delivery trucks were being delayed for hours on several regular occasions.

(4) Large automobile manufacturers were suffering acute economic losses as a result of delayed just-in-time deliveries.

(5) These delays were caused, in part, by too few tollbooths.

(6) The DIBC's proposed construction projects would increase traffic flow over the bridge and reduce traffic delays.

(7) All federal agencies within the bridge complex were involved in the planning, locating, and designing processes of all DIBC construction plans (present and past).

12

The trial court applied the test espoused by the court in *United States v Michigan* to these facts.  After a review for clear error, we decline to reverse any of the trial court's factual findings.  However, we do recognize that the evidence the city proffered at trial contradicted several of these findings.  Indeed, before this Court, the city persuasively marshaled the testimony of two federal employees who work in the bridge complex.  Their testimony contradicted the DIBC's contentions that the proposed construction would reduce traffic delays and that the federal government overtly controlled or mandated the construction projects.  Furthermore, the city makes a strong factual argument that federal control over the DIBC is attenuated at best because the federal government only exercises negative control (or veto power) over the proposed projects.

But those factual assertions were better argued before the trial court under a preponderance of the evidence standard.  Those factual arguments face review by this Court for clear error, which means the city must leave us with the definite and firm conviction that a mistake has been made in the factual basis that the trial court relied on.  *In re Miller*, 433 Mich at 337.  The city has not met its burden of proving that the trial court's factual findings were clearly erroneous because each of those findings was supported by valid evidence and testimony the DIBC presented that belied the city's factual arguments.  Simply put, we will not answer the city's call for us to retry the credibility of competing evidence and witnesses' testimony simply because the city lost in what is a unique and close factual

13

contest. Therefore, we accept the trial court's factual findings and proceed to review de novo the legal rulings below.

The first legal question is whether, under the *United States v Michigan* test, the DIBC is a federal instrumentality. The first factor of that test asks for what function the DIBC was established and whether that function advances a federal purpose. Applying this factor to this case is somewhat like putting a square peg into a round hole because the DIBC was in existence before the Ambassador Bridge's commission.[6] Nonetheless, in this case, it is reasonable to apply this factor by asking what function served as the impetus for the DIBC to enter into its current interaction with the federal government.[7]

The DIBC's interaction with the federal government is tied to the federal purpose of the Ambassador Bridge, which is ostensibly facilitating the flow of interstate and foreign commerce. Indeed, for commerce purposes, Congress directed the DIBC to "construct, maintain, and operate" the bridge. PL 66-395, 41 Stat 1439. Thus, if the DIBC is tasked to build, operate, and maintain the bridge, and if the bridge was made for the federal purpose of free-flowing commerce, then

---

[6] In actuality, the DIBC's predecessor existed before the bridge's commission, but we see no error in viewing the DIBC and its corporate predecessor as one for the purposes of this case because the act authorizing the bridge does just that.

[7] See *Johnson*, 254 US at 57, holding that federal-instrumentality immunity applied to a federal employee who obviously existed (because he had been born) before he gained federal-instrumentality status by being hired by the government as a mail carrier.

14

the function that served as the impetus for the DIBC's interaction with the federal government was the federal purpose of free-flowing interstate and foreign commerce. Therefore, this factor favors federal-instrumentality status for the DIBC.

The second factor asks whether the DIBC continues to serve that function. The DIBC is still maintaining and operating the Ambassador Bridge, which necessarily furthers the federal purpose of free-flowing interstate and foreign commerce. Thus, this factor favors federal-instrumentality status for the DIBC.

The third factor evaluates the significance of the federal control exerted on, and the federal involvement with, the DIBC. Relying on the facts found by the trial court, we agree with that court's legal holding that "there is a strong and substantial level of Federal control and involvement with the DIBC within the Bridge Complex," such that this factor favors federal-instrumentality status for the DIBC.

The trial court's factual findings support this legal conclusion. The federal government maintains strict control over the compound. The trial court stated that "if it is in the compound, it is under federal control." The compound is maintained as a sterile area that is not open to the public for common usage. By federal edict, all entering traffic that is not associated with a federal agency or the DIBC must continue on to Canada. United States customs can randomly search any vehicle or person in the compound, including all DIBC workers. The federal agencies do not allow any DIBC personnel to photograph any portion of the compound. The

15

federal agencies exercise veto power over all construction projects in the compound. When the DIBC began planning the construction projects in question, it was required, as with any such project, to gain the federal agencies' approval. Those agencies denied the DIBC's initial requests for approval. The DIBC then adopted federally mandated modifications and began the construction projects. Thus, the federal government, having the power to preclude the DIBC's construction projects, at least implicitly approved the projects' final design and construction. This is most evident in the physical structures' existence today. In light of these facts, the trial court stated that "[t]he evidence in this case establishes that the overall effective and efficient management of the bridge is only accomplished through the cooperative mutual effort and coordinated activity of the DIBC and the various federal agencies maintaining a presence at the bridge complex." Therefore, this third factor favors federal-instrumentality status for the DIBC.

Regarding this third factor, we note that the city and the Court of Appeals, in suggesting deficient federal control for federal-instrumentality status, make much of the fact that the DIBC is financially independent from the federal government. They argue that the DIBC is simply a moneymaking private citizen whose interest is purely in moving more traffic in order to gain more profit from tolls, the sale of duty-free goods, and fuel dispensing. In essence, they believe that the DIBC cannot metamorphose itself into being a federal instrumentality on the basis of a financially driven decision that has a coincidentally beneficial effect on

16

an unrelated federal purpose. They support this argument by noting that the federal agencies in the bridge compound never mandated the DIBC's proposed changes and that, in fact, those agencies have expressed ambivalence toward the projects' going forward.

We disagree with those arguments.

Again, federal-instrumentality status is not necessarily an all-encompassing status for all of the private actor's activities. In that regard, the DIBC's monetary interest and motivations are irrelevant to its federal-instrumentality status. What is relevant is that the DIBC is acting in furtherance of a federal purpose. The trial court relied on record evidence that showed that the construction projects were motivated by an attempt to facilitate bridge traffic: the new, separate tollbooths were successful attempts to separate automobiles and trucks, and the diesel-pump project allowed diesel-powered trucks to fuel more efficiently in a location separate from that for gasoline-driven automobiles. Also, the old diesel location required 53-foot-long semi-trucks to negotiate a 90-degree turn, whereas the new location allowed for a straighter and more efficient system of fueling. Accordingly, as stated earlier, we accept the trial court's finding that the DIBC, irrespective of its financial motives, is trying to facilitate bridge traffic by means of these projects.

Additionally, the fact that the federal agencies at the bridge complex did not mandate the projects is irrelevant because those agencies are directed to control and regulate federal purposes that are distinct from the free-flowing-traffic

17

purpose, such as customs, immigration control, and border security. This explains the agencies' ambivalence toward the projects; the agencies are unconcerned with any traffic-facilitation projects unless such projects inhibit their distinct federal purposes. Yet, as previously noted, foreign and interstate traffic over the bridge is a federal purpose. Thus, what is relevant here is whether the DIBC was acting in furtherance of that federal purpose. In accepting the trial court's statement that "[t]here was sufficient evidence presented by DIBC for the [c]ourt to conclude that DIBC's proposed construction will have a positive impact on traffic flow and reduce delays for traffic at the bridge," we necessarily accept that such an action was in furtherance of the DIBC's federal mandate to maintain and operate the bridge.

With all three factors favoring federal-instrumentality status, we next apply the conduct-based test used by the court in *Name.Space*. Like the instrumentality in *Name.Space*, the DIBC does not have status-based immunity, which is absolute immunity, because it is only tasked to conduct a limited federal purpose. Thus, like the instrumentality in *Name.Space*, the DIBC has conduct-based immunity, which applies only to its conduct that furthers its federal purpose. As discussed earlier, Congress has required the DIBC to build, operate, and maintain the bridge. Thus, like the instrumentality in *Name.Space*, which had immunity for conduct that it was required to do under its contract with the federal agency, the DIBC has immunity for its conduct in the operation and maintenance of the Ambassador Bridge. While operating the bridge, the DIBC must keep the flow of bridge traffic

at an optimal level.  Thus, the DIBC's conduct-based immunity extends to its conduct that facilitates bridge traffic.

Therefore, under both the test in *United States v Michigan* and the conduct-based test in *Name.Space*, the trial court correctly concluded that the DIBC is an instrumentality of the federal government for the limited purpose of facilitating traffic flow over the bridge.

We note that the DIBC's status as a federal instrumentality is limited to actions that are clearly and directly associated with the facilitation of traffic across the Ambassador Bridge.  Accordingly, the DIBC may not fit its non-traffic-facilitative actions into this status.  This issue could be described as evaluating the scope of the federal instrumentality's immunity.  This issue is particularly important in cases of limited federal instrumentalities, such as this case, because immunity extends only to acts that are within the scope of instrumentality's federal purpose.  While we do not attempt to list all the actions that do or do not fall within the DIBC's scope of immunity, we agree with the trial court that the DIBC's construction projects are within its scope of immunity.

The trial court's factual findings are compelling on this issue.  It held that the volume of bridge traffic was problematically low, that the construction projects were meant to increase that volume, and that the projects accomplished that goal.  Therefore, under a conduct-based immunity test, the DIBC's construction projects were within the scope of its limited federal-instrumentality immunity because they were directly motivated by the DIBC's federal purpose and they actually worked

19

to promote that purpose. Finally, we caution that there is a line where this immunity stops because the instrumentality's act is outside the scope of its federal purpose; however, the DIBC's construction projects have not crossed the line in this case.

But our analysis does not end by declaring the DIBC a limited federal instrumentality and holding that its construction projects were actions within its scope of immunity. Indeed, "where an entity with federal instrumentality status claims immunity from a particular state exaction, the proper test is whether that exaction will interfere with the entity's federal function." *James,* 471 F Supp 2d at 242. And, if the city's ordinance does interfere with the DIBC's limited federal purpose, we must analyze the magnitude of that interference because federal instrumentalities are not "insulated from incidental or nonburdensome local requirements." *Don't Tear It Down,* 206 US App DC at 130-131, citing *Kleppe v New Mexico*, 426 US 529, 543; 96 S Ct 2285; 49 L Ed 2d 34 (1976), *Evansville-Vanderburgh Airport Auth Dist v Delta Airlines, Inc*, 405 US 707, 720-721; 92 S Ct 1349; 31 L Ed 2d 620 (1972), *Wilson v Cook*, 327 US 474, 486-488; 66 S Ct 663; 90 L Ed 793 (1946), and *Johnson, supra* at 56.

Justice Holmes made this point clear in his opinion in *Johnson*, 254 US at 56. As discussed earlier, the defendant in *Johnson* was an employee of the United States Postal Service who challenged his conviction for driving a motor vehicle without a state-issued driver's license. *Id*. at 55. In reversing the defendant's conviction, the Court held that, as "instruments of the United States," federal

20

employees, like the defendant, were immune from the state's requirement of obtaining a driver's license before conducting their federal purposes. *Id*. at 57. However, Justice Holmes also cautioned that

> an employee of the United States does not secure a general immunity from state law while acting in the course of his employment. . . . It very well may be that, when the United States has not spoken, the subjection to local law would extend to general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." [*Id*. at 56.]

In other words, the defendant in *Johnson* was immune from state or local regulations that sufficiently inhibited his federal purpose, but he was not immune from local regulations that merely incidentally affected his operation as a federal instrumentality.

This case presents an example of a sufficient inhibition of an instrumentality's federal purpose; the local regulation's effect is not merely incidental. Indeed, application of the city's ordinance would effectively stop the DIBC's construction projects. Furthermore, if the ordinance had applied to the DIBC, the traffic problems on the bridge would have persisted. Therefore, because the city's ordinance would have completely stopped the DIBC's actions, which were within the scope of its federal purpose, the DIBC is immune from that local regulation as a limited federal instrumentality.

The city makes two claims in arguing that its ordinance does not interfere with the DIBC's federal purpose such that preemption is required. First, in May 2007, the city issued a variance to the DIBC that purportedly allowed the

construction projects at issue here; therefore, it argues that preemption analysis is rendered moot. We disagree. This "Court does not reach moot questions or declare principles or rules of law that have no practical legal effect in the case before us unless the issue is one of public significance that is likely to recur, yet evade judicial review." *Federated Publications, Inc v City of Lansing*, 467 Mich 98, 112; 649 NW2d 383 (2002), citing *In re Midland Publishing*, 420 Mich 148, 152 n 2; 362 NW2d 580 (1984). Thus, while the issue is moot because the DIBC's authority to undertake the construction projects is no longer at issue with respect to the variance, we conclude that the legal question is justiciable because it is likely to arise again and avoid judicial review. As the DIBC aptly points out, the variance has many amorphous conditions concerning noise, smoke, and odor, all of which effectively give the city unrestricted authority to revoke the variance. If the city later revokes the variance and applies its zoning ordinance to the DIBC, and if the DIBC challenges that application of the ordinance, the city could simply reissue the variance and stop the DIBC's challenge by claiming mootness. Also, this issue resolves the legal dispute concerning the operation of the busiest international border in the state; therefore, it is clearly an issue of public concern. Thus, we find this issue justiciable.

Next, the city contends that the ordinance primarily restricts the DIBC's business expansion and that any restriction on the projects is incidental to the effect on bridge traffic. The city supports this by noting that the bridge can still operate without these construction projects, as it did in the past. Our response is

22

twofold. First, we reiterate that the DIBC's economic interests in these projects are of no moment. What is relevant is whether application of the city's ordinance sufficiently hinders the DIBC in carrying out its federal purpose. Second, the city's argument that limiting the bridge to its preconstruction state merely incidentally affects bridge traffic misses the point. The city fails to acknowledge that the federal government's interest lies in sustaining free-flowing commerce by increasing bridge traffic above its preconstruction, problematic level. Instead, the city wrongly contends that the preconstruction level of traffic, or commerce, was acceptable. But that argument is not supported by the trial court's factual findings. Therefore, this argument is of no avail to the city.

Accordingly, the DIBC, as a limited federal instrumentality, is immune from the city's ordinance as it applies to the construction projects before us.

Finally, the Court of Appeals reliance on *American Seed Co* and *Int'l Bridge Co* is misplaced. Those cases simply stand for the fact that international bridges are not so pervasively controlled by federal law that field preemption will always apply to invalidate any state or local regulation of them. In other words, both the state and federal governments have interests in international bridges. But that truism does not affect our ruling today. Indeed, those opinions did not analyze federal-instrumentality preemption. Moreover, our decision today, while accepting that the city does have some interest in (and regulatory authority over) the Ambassador Bridge, only holds that the city has gone too far in inhibiting the

DIBC's limited federal purpose. We say nothing to disturb the venerable holdings of the *American Seed Co* and *Int'l Bridge Co*.

Because we are satisfied that the trial court was correct in its federal-instrumentality analysis, and because we believe that analysis provides an adequate basis for our ruling today, we see it as prudential not to evaluate the rulings of the trial court or the Court of Appeals regarding any other preemption theories.

IV. CONCLUSION

After accepting the facts established by the trial court, we affirm the judgment of the trial court, reverse the judgment of the Court of Appeals, and hold that the DIBC is a federal instrumentality for the limited purpose of facilitating traffic flow across the Ambassador Bridge and is, therefore, immune from any state law or local regulation that directly inhibits that purpose. Further, we affirm the trial court's holding that this particular application of the city's zoning ordinance inhibits the DIBC's federal purpose. However, we choose not to formulate an arbitrary bright-line rule concerning future conflicts between the DIBC, in its limited federal-instrumentality status, and state or local regulation. We trust the trial courts to examine whether a state law or local regulation directly inhibits the DIBC's unique and limited federal-instrumentality status in any future disputes.

The judgment of the Court of Appeals is reversed, and the case is remanded to the trial court for the entry of an injunction consistent with this opinion.

Michael F. Cavanagh
Clifford W. Taylor
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

CITY OF DETROIT,

       Plaintiff/Counter-Defendant-
       Appellee,

v                                      No. 132329

AMBASSADOR BRIDGE COMPANY,
a/k/a DETROIT INTERNATIONAL
BRIDGE COMPANY,

       Defendant/Counter-Plaintiff-
       Appellant.

_____

CORRIGAN, J. (*concurring*).

I concur in Justice Cavanagh's analysis. I write separately to emphasize the limited scope of the federal-instrumentality status of the Detroit International Bridge Company (DIBC) with regard to its commercial operation of fueling stations and similar activities that are less directly related to taking tolls or facilitating bridge traffic. I also write to underscore Justice Cavanagh's point that even activities that are related to the DIBC's federal purpose are not entirely immune from local regulation.

As Justice Cavanagh states, "the DIBC is an instrumentality of the federal government for the limited purpose of facilitating traffic flow over the bridge." *Ante* at 19. The trial court reasonably concluded that the new configuration of the diesel station aided traffic flow. Further, the city does not appear to have argued

that the DIBC wrongly maintained a station in its previous location or violated local zoning requirements *merely* by slightly increasing the number of pumps. Accordingly, I agree with the trial court's result and this Court's reasons for affirming that result.

I would simply emphasize, first, that the record does not establish the extent to which maintaining a diesel fueling station *at all* relates to the DIBC's federal purpose.[1] Rather, because the city did not challenge the existence of the station itself, the trial court correctly focused on whether the station's *reconfiguration*— not its *existence*—furthered the DIBC's federal purpose. Therefore, I find it worth noting that the DIBC may not engage in unfettered expansion or movement of its current activities simply because expansion or relocation aids traffic flow; rather, the activity to be relocated or the expansion of that activity must *itself* be related to the DIBC's federal purpose in order for it to be immune from full regulation by the city. I highlight Justice Cavanagh's conclusion that, in analyzing limited, conduct-based immunity, the facts underlying each action challenged must be examined to ensure that the action does not cross the "line where this immunity

---

[1] Perhaps commercial trucks' use of the bridge—which may include idling and delays as a result of federal activities including customs inspections—is significantly facilitated by on-site access to diesel fuel. Perhaps the DIBC derives profit from its fueling operation that offsets the costs of maintaining the bridge and, therefore, enables tolls to remain at affordable levels. Nonetheless, because the city challenged only the reconfiguration of the fueling station, the exact nature of the station's relationship to the DIBC's federal purpose is not at issue.

stops because the instrumentality's act is outside the scope of its federal purpose[.]" *Ante* at 20.

Second, I would emphasize that all local regulation is not automatically preempted with respect to the DIBC's immune activities. Justice Cavanagh notes that the city issued a variance to the DIBC that included amorphous conditions concerning noise, smoke, and odor at the DIBC's site. The conditions effectively give the city unrestricted authority to revoke the variance. *Ante* at 22. Because the variance gives the city the same broad power to inhibit the DIBC's federally mandated activities as did the zoning ordinance, the variance would be similarly preempted. But because the city seeks, in part, to regulate public health and safety, including local air quality, I note that the city retains the traditional police power to protect the health and safety of its citizens.[2] The city may certainly

---

[2] As the United States Supreme Court observed in *Pike v Bruce Church, Inc*, 397 US 137, 142; 90 S Ct 844; 25 L Ed 2d 174 (1970), "the extent of the burden [from local regulation] that will be tolerated will of course depend on the nature of the local interest involved . . . ." The state's traditional police power to protect the health and safety of its citizens is unquestioned. The Supreme Court has observed:

> In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when "conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." [*Huron Portland Cement Co v Detroit*, 362 US 440, 443-444; 80 S Ct 813; 4 L Ed 2d 53 (1960) (citation omitted).]

(continued…)

3

impose health and safety regulations to the extent that those regulations do not inhibit the DIBC's ability to carry out its federal purpose.

Maura D. Corrigan

---

(continued…)
Similarly, see *Gen Motors Corp v Tracy*, 519 US 278, 306-307; 117 S Ct 811; 136 L Ed 2d 761(1997); *Head v New Mexico Bd of Optometry Examiners*, 374 US 424, 428-429; 83 S Ct 1759; 10 L Ed 2d 983 (1963).