TEXAS INDUSTRIES, INC. *v.* RADCLIFF MATERIALS,
INC., ET AL.

No. 79–1144.   Argued March 3, 1981—Decided May 26, 1981

Burger, C. J., delivered the opinion for a unanimous Court.

*Benjamin R. Slater, Jr.,* argued the cause for petitioner. With him on the briefs was *William J. Hamlin.*

*Dando B. Cellini* argued the cause for respondents. With him on the brief were *James A. Babst, Ewell P. Walther, Jr.,* and *Stephen H. Kupperman.*

*Solicitor General McCree* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Assistant Attorney General Litvack, Deputy Solicitor General Wallace, Stephen M. Shapiro, Barry Grossman,* and *Bruce E. Fein.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed by *Eugene Driker* for Borman's Inc.; by *Denis McInerney, William T. Lifland,* and *Allen S. Joslyn* for CPC International Inc.; by *Cloyd R. Mellott, J. Gary Kosinski, Ray C. Stoner, Michael R. Borasky, James M. Nicholson,* and *William E. Craig* for Georgia-Pacific Corp. et al.; by *Harold F. Baker, Alan M. Wiseman,* and *Gaspare J. Bono* for Mead Corp.; and by *Leslie H. Arps, Kenneth A. Plevan, John M. Nannes, Richard M. Schwartz,* and *Thomas R. Long* for Westvaco Corp.

Briefs of *amici curiae* urging affirmance were filed by *R. Clifford Potter* for Boise Cascade Corp.; by *Lowell E. Sachnoff* and *Stephen D. Susman* for the Corrugated Container Class in M. D. L. 310; by *David L. Foster* and *John W. Malley* for Duplan Corp.; and by *Robert M. Johnson* for River Cement Co.

Briefs of *amici curiae* were filed by *James W. Witherspoon* for A. L. Black et al.; by *Harold G. Christensen, Michael R. Carlston,* and *Craig S. Cook* for Olson Farms, Inc.; by *Earl E. Pollock* for Owens-Illinois, Inc., et al.; by *Richard W. Odgers* and *C. Douglas Floyd* for Safeway Stores, Inc.; and by *Donald G. Kempf, Jr.,* and *Hammond E. Chaffetz* for Weyerhaeuser Co. et al.

632

CHIEF JUSTICE BURGER delivered the opinion of the Court.

This case presents the question whether the federal anti-trust laws allow a defendant, against whom civil damages, costs, and attorney's fees have been assessed, a right to contribution from other participants in the unlawful conspiracy on which recovery was based. We granted certiorari to resolve a conflict in the Circuits. 449 U. S. 949 (1980).[1] We affirm.

I

Petitioner and the three respondents manufacture and sell ready-mix concrete in the New Orleans, La., area. In 1975, the Wilson P. Abraham Construction Corp., which had purchased concrete from petitioner, filed a civil action in the United States District Court for the Eastern District of Louisiana naming petitioner as defendant;[2] the complaint alleged that petitioner and certain unnamed concrete firms had conspired to raise prices in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, which provides in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

The complaint sought treble damages plus attorney's fees under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the anti-

---

[1] Compare *Wilson P. Abraham Construction Corp.* v. *Texas Industries, Inc.*, 604 F. 2d 897 (CA5 1979) (this case), and *Olson Farms, Inc.* v. *Safeway Stores, Inc.*, 1979-2 Trade Cases ¶ 62,995 (CA10), rehearing en banc granted (Dec. 27, 1979), with *Professional Beauty Supply, Inc.* v. *National Beauty Supply, Inc.*, 594 F. 2d 1179 (CA8 1979).

[2] The complaint also named one of petitioner's former employees as a codefendant; this employee has never been served.

trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." [3]

Through discovery, petitioner learned that Abraham believed respondents were the other concrete producers that had participated in the alleged price-fixing scheme.[4] Petitioner then filed a third-party complaint against respondents seeking contribution from them should it be held liable in the action filed by Abraham. The District Court dismissed the third-party complaint for failure to state a claim upon which relief could be granted, holding that federal law does not allow an antitrust defendant to recover in contribution from co-conspirators. The District Court also determined there was no just reason for delay with respect to that aspect of the case and entered final judgment under Federal Rule of Civil Procedure 54 (b).

On appeal, the Court of Appeals for the Fifth Circuit affirmed, holding that, although the Sherman and the Clayton Acts do not expressly afford a right to contribution, the issue should be resolved as a matter of federal common law. *Wilson P. Abraham Construction Corp.* v. *Texas Industries, Inc.,* 604 F. 2d 897 (1979). The court then examined what it perceived to be the benefits and the difficulties of contribution and concluded that no common-law rule of contribution should be fashioned by the courts.

---

[3] The phrase "antitrust laws" includes the Sherman Act and the Clayton Act. 15 U. S. C. § 12 (a).

[4] In 1973, a federal grand jury in Louisiana issued indictments against petitioner, respondents (or their corporate predecessors), and certain employees charging a price-fixing conspiracy in violation of § 1 of the Sherman Act. Each defendant ultimately entered a plea of *nolo contendere.*

## II

The common law provided no right to contribution among joint tortfeasors. *Union Stock Yards Co.* v. *Chicago, B. & Q. R. Co.,* 196 U. S. 217 (1905); W. Prosser, Law of Torts § 50, pp. 305–307 (4th ed. 1971). See *Merryweather* v. *Nixan,* 8 Term Rep. 186, 101 Eng. Rep. 1337 (K. B. 1799). See also *Northwest Airlines, Inc.* v. *Transport Workers, ante,* at 86–87, n. 16. In part, at least, this common-law rule rested on the idea that when several tortfeasors have caused damage, the law should not lend its aid to have one tortfeasor compel others to share in the sanctions imposed by way of damages intended to compensate the victim. *E. g., Atkins* v. *Johnson,* 43 Vt. 78, 81–82 (1870). See Leflar, Contribution and Indemnity Between Tortfeasors, 81 U. Pa. L. Rev. 130, 130–134 (1932). Since the turn of the century, however, 39 states and the District of Columbia have fashioned rules of contribution in one form or another, 10 initially through judicial action and the remainder through legislation. See *Northwest Airlines, Inc.* v. *Transport Workers, ante,* at 86–87, and n. 16. Because courts generally have acknowledged that treble-damages actions under the antitrust laws are analogous to common-law actions sounding in tort,[5] we are urged to follow this trend and adopt contribution for antitrust violators.

The parties and *amici* representing a variety of business

---

[5] See, *e. g., Solomon* v. *Houston Corrugated Box Co.,* 526 F. 2d 389, 392, n. 4 (CA5 1976); *Simpson* v. *Union Oil Co.,* 311 F. 2d 764, 768 (CA9 1963); *Northwestern Oil Co.* v. *Socony-Vacuum Oil Co.,* 138 F. 2d 967, 970 (CA7), cert. denied, 321 U. S. 792 (1943); *Williamson* v. *Columbia Gas & Elec. Corp.,* 110 F. 2d 15, 18 (CA3 1939), cert. denied, 310 U. S. 639 (1940). Cf. *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 552 (1902). Although not expressly characterizing antitrust violations as tortious, our opinion in *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 401 U. S. 321, 342–348 (1971), repeatedly referred to common-law rules and trends regarding release of joint tortfeasors in determining the validity of a release of an alleged antitrust violator.

interests—as well as a legion of commentators [6]—have thoroughly addressed the policy concerns implicated in the creation of a right to contribution in antitrust cases. With potentially large sums at stake, it is not surprising that the numerous and articulate *amici* disagree strongly over the basic issue raised: whether sharing of damages liability will advance or impair the objectives of the antitrust laws.

Proponents of a right to contribution advance concepts of fairness and equity in urging that the often massive judgments in antitrust actions be shared by all the wrongdoers. In the abstract, this position has a certain appeal: collective fault, collective responsibility. But the efforts of petitioner and supporting *amici* to invoke principles of equity presuppose a legislative intent to allow parties violating the law to draw upon equitable principles to mitigate the consequences of their wrongdoing. Moreover, traditional equitable standards have something to say about the septic state of the hands of such a suitor in the courts, and, in the context of one wrongdoer suing a co-conspirator, these standards similarly suggest that parties generally *in pari delicto* should be left where they are found. See *supra,* at 634.[7]

---

[6] See, *e. g.,* Cirace, A Game Theoretic Analysis of Contribution and Claim Reduction in Antitrust Treble Damage Suits, 55 St. John's L. Rev. 42 (1980); Corbett, Apportionment of Damages and Contribution Among Coconspirators in Antitrust Treble Damage Actions, 31 Ford. L. Rev. 111 (1962); Easterbrook, Landes, & Posner, Contribution Among Antitrust Defendants: A Legal and Economic Analysis, 23 J. Law & Econ. 331 (1980); Floyd, Contribution Among Antitrust Violators: A Question of Legal Process, 1980 B. Y. U. L. Rev. 183; Polinsky & Shavell, Contribution and Claim Reduction Among Antitrust Defendants: An Economic Analysis, 33 Stan. L. Rev. 447 (1981); Note, 63 Cornell L. Rev. 682 (1978); Note, 48 Geo. Wash. L. Rev. 749 (1980); Note, 93 Harv. L. Rev. 1540 (1980); Note, 78 Mich. L. Rev. 892 (1980); Note, 58 Texas L. Rev. 961 (1980); Recent Developments, 33 Vand. L. Rev. 979 (1980); Note, 66 Va. L. Rev. 797 (1980).

[7] Of course, not all equitable principles apply in antitrust cases. For example, in *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392

The proponents of contribution also contend that, by allowing one violator to recover from co-conspirators, there is a greater likelihood that most or all wrongdoers will be held liable and thus share the consequences of the wrongdoing. It is argued that contribution would thus promote more vigorous private enforcement of the antitrust laws and thereby deter violations, one of the important purposes of the treble-damages action under § 4 of the Clayton Act. See, *e. g.*, *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 344 (1979); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 485 (1977); *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 262 (1972); *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 139 (1968). Independent of this effect, a right to contribution may increase the incentive of a single defendant to provide evidence against co-conspirators so as to avoid bearing the full weight of the judgment. Realization of this possibility may also deter one from joining an antitrust conspiracy.

Respondents and *amici* opposing contribution point out that an even stronger deterrent may exist in the possibility, even if more remote, that a single participant could be held fully liable for the total amount of the judgment. In this view, each prospective co-conspirator would ponder long and hard before engaging in what may be called a game of "Russian roulette."[8] Moreover, any discussion of this problem

U. S. 134 (1968), the Court held that traditional notions of *in pari delicto* would not bar a franchisee from recovering from its franchisor even though the franchisee had sought a franchise and thus, to some degree, acquiesced in the scheme alleged to be illegal.

[8] Economists disagree over whether business decisionmakers, be they the high-level or the middle-level management, are "risk averse"; *i. e.*, they would prefer a greater certainty of a small loss to a less certain chance of a greater loss. Compare K. Elzinga & W. Breit, The Antitrust Penalties 126–129 (1976), with Easterbrook, Landes, & Posner, *supra* n. 6, at 352, n. 50. See also Polinsky & Shavell, *supra* n. 6, at 452–455; Shavell, Risk Sharing and Incentives in the Principal and Agent Relationship, 10 Bell J. Econ. 55 (1979).

must consider the problem of "overdeterrence," *i. e.,* the possibility that severe antitrust penalties will chill wholly legitimate business agreements. See *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 441–442 (1978).

The parties and *amici* also discuss at length how a right to contribution should be structured and, in particular, how to treat problems that may arise with the allocation of damages among the wrongdoers and the effect of settlements. Dividing or apportioning damages among a cluster of co-conspirators presents difficult issues, for the participation of each in the conspiracy may have varied. Some may have profited more than others; some may have caused more damage to the injured plaintiff. Some may have been "leaders" and others "followers"; one may be a "giant," others "pygmies." [9] Various formulae are suggested: damages may be allocated according to market shares, relative profits, sales to the particular plaintiff, the role in the organization and operation of the conspiracy, or simply pro rata, assessing an equal amount against each participant on the theory that each one is equally liable for the injury caused by collective action. In addition to the question of allocation, a right to contribution may have a serious impact on the incentive of defendants to settle. Some *amici* and commentators have suggested that the total amount of the plaintiff's claim should be reduced by the amount of any settlement with any one co-conspirator; others

---

[9] A small business that mimics the practices of larger companies may be participating directly in the conspiracy or simply "tagging along" with larger companies. See, *e. g.,* Markham, The Nature and Significance of Price Leadership, 41 Amer. Econ. Rev. 891 (1951); Posner, Oligopoly and the Antitrust Laws: A Suggested Approach, 21 Stan. L. Rev. 1562, 1582 (1969); Washburn, Price Leadership, 64 Va. L. Rev. 691, 693–697, 708–712 (1978). Although following industry leaders may help support an inference of agreement, "this Court has never held that proof of parallel business behavior [by itself] conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense." *Theatre Enterprises, Inc.* v. *Paramount Film Distributing Corp.,* 346 U. S. 537, 541 (1954).

strongly disagree. Similarly, vigorous arguments can be made for and against allowing a losing defendant to seek contribution from co-conspirators who settled with the plaintiff before trial. Regardless of the particular rule adopted for allocating damages or enforcing settlements, the complexity of the issues involved may result in additional trial and pretrial proceedings, thus adding new complications to what already is complex litigation. See, *e. g., Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 737–747 (1977).

### III

The contentions advanced indicate how views diverge as to the "unfairness" of not providing contribution, the risks and trade-offs perceived by decisionmakers in business, and the various patterns for contribution that could be devised. In this vigorous debate over the advantages and disadvantages of contribution and various contribution schemes, the parties, *amici,* and commentators have paid less attention to a very significant and perhaps dispositive threshold question: whether courts have the power to create such a cause of action absent legislation and, if so, whether that authority should be exercised in this context.

Earlier this Term, in *Northwest Airlines, Inc.* v. *Transport Workers, ante,* p. 77, we addressed the similar question of a right to contribution under the Equal Pay Act of 1963, 29 U. S. C. § 206 (d), and Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* We concluded that a right to contribution may arise in either of two ways: first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or, second, through the power of federal courts to fashion a federal common law of contribution. *Ante,* at 90–91.[10]

---

[10] In *Northwest Airlines,* we decided that no such right exists under the Equal Pay Act or Title VII, and we declined to fashion such a right from federal common law.

## A

There is no allegation that the antitrust laws expressly establish a right of action for contribution. Nothing in these statutes refers to contribution, and if such a right exists it must be by implication. Our focus, as it is in any case involving the implication of a right of action, is on the intent of Congress. *E. g., California* v. *Sierra Club, ante,* p. 287; *Universities Research Assn.* v. *Coutu,* 450 U. S. 754 (1981); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979); *Touche Ross & Co.* v. *Redington,* 442 U. S. 560 (1979). Congressional intent may be discerned by looking to the legislative history and other factors: *e. g.,* the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional role of the states in providing relief. See *California* v. *Sierra Club, supra; Cort* v. *Ash,* 422 U. S. 66 (1975).

Petitioner readily concedes that "there is nothing in the legislative history of the Sherman Act or the Clayton Act to indicate that Congress considered whether contribution was available to defendants in antitrust actions." Brief for Petitioner 10. Moreover, it is equally clear that the Sherman Act and the provision for treble-damages actions under the Clayton Act were not adopted for the benefit of the participants in a conspiracy to restrain trade. On the contrary, petitioner "is a member of the class whose activities Congress intended to regulate for the protection and benefit *of an entirely distinct class,*" *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1, 37 (1977) (emphasis added). The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers. The absence of any reference to contribution in the legislative history or of any possibility that Congress was concerned with softening the blow on joint wrongdoers in this setting makes examination of other factors unnecessary. *California* v. *Sierra Club, ante,* at 298; *Touche Ross & Co.* v.

*Redington, supra,* at 574–576. We therefore conclude that Congress neither expressly nor implicitly intended to create a right to contribution.[11] If any right to contribution exists, its source must be federal common law.

## B

There is, of course, "no federal general common law." *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 78 (1938). Nevertheless, the Court has recognized the need and authority in some limited areas to formulate what has come to be known as "federal common law." See *United States* v. *Standard Oil Co.,* 332 U. S. 301, 308 (1947). These instances are "few and restricted," *Wheeldin* v. *Wheeler,* 373 U. S. 647, 651 (1963), and fall into essentially two categories: those in which a federal rule of decision is "necessary to protect uniquely federal interests," *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 426 (1964), and those in which Congress has given the courts the power to develop substantive law, *Wheeldin* v. *Wheeler, supra,* at 652.

## (1)

The vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal

---

[11] That Congress knows how to define a right to contribution is shown by the express actions for contribution under § 11 (f) of the Securities Act of 1933, 15 U. S. C. § 77k (f), and §§ 9 (e) and 18 (b) of the Securities Exchange Act of 1934, 15 U. S. C. §§ 78i (e) and 78r (b). Some courts have extrapolated from these provisions that when an implied right of action exists under the securities laws, there also is an implied right to contribution. See, *e. g., Heizer Corp.* v. *Ross,* 601 F. 2d 330 (CA7 1979); *Globus, Inc.* v. *Law Research Service, Inc.,* 318 F. Supp. 955 (SDNY), aff'd, 442 F. 2d 1346 (CA2), cert. denied, 404 U. S. 941 (1971); *De Haas* v. *Empire Petroleum Co.,* 286 F. Supp. 809 (Colo. 1968), aff'd in part, rev'd in part, 435 F. 2d 1223 (CA10 1970). We intimate no view as to the correctness of these decisions; in any event, they do not support implication of a right to contribution when a statute expressly creates a damages action but does not provide for contribution. See *Northwest Airlines, Inc.* v. *Transport Workers, ante,* at 91–92, n. 24.

common law, *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580, 591 (1973), nor does the existence of congressional authority under Art. I mean that federal courts are free to develop a common law to govern those areas until Congress acts. Rather, absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States,[12] interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations,[13] and admiralty cases.[14] In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control.

In areas where federal common law applies, the creation of a right to contribution may fall within the power of the federal courts. For example, in *Cooper Stevedoring Co.* v. *Fritz Kopke, Inc.,* 417 U. S. 106 (1974), we held that con-

---

[12] See, *e. g., United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580 (1973); *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943).

[13] See, *e. g., Illinois* v. *Milwaukee,* 406 U. S. 91 (1972); *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964); *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.,* 304 U. S. 92 (1938). Many of these cases arise from interstate water disputes. Such cases do not directly involve state boundaries, disputes over which more often come to this Court under our original jurisdiction; they nonetheless involve especial federal concerns to which federal common law applies. In *Hinderlider* v. *La Plata River & Cherry Creek Ditch Co., supra,* at 110, decided the same day as *Erie,* the Court observed:

"Jurisdiction over controversies concerning rights in interstate streams is not different from those concerning boundaries. These have been recognized as presenting federal questions."

[14] See, *e. g., Edmonds* v. *Compagnie Generale Transatlantique,* 443 U. S. 256 (1979); *Fitzgerald* v. *United States Lines Co.,* 374 U. S. 16 (1963).

tribution is available among joint tortfeasors for injury to a longshoreman. But that claim arose within admiralty jurisdiction, one of the areas long recognized as subject to federal common law, see *Edmonds* v. *Compagnie Generale Transatlantique,* 443 U. S. 256, 259 (1979); our decision there was based, at least in part, on the traditional division of damages in admiralty not recognized at common law, see 417 U. S., at 110. *Cooper Stevedoring* thus does not stand for a general federal common-law right to contribution. See *Northwest Airlines, Inc.* v. *Transport Workers, ante,* at 96–97.

The antitrust laws were enacted pursuant to the power of Congress under the Commerce Clause, Art. I, § 8, cl. 3, to regulate interstate and foreign trade, and the case law construing the Sherman Act now spans nearly a century. Nevertheless, a treble-damages action remains a private suit involving the rights and obligations of private parties. Admittedly, there is a federal interest in the sense that vindication of rights arising out of these congressional enactments supplements federal enforcement and fulfills the objects of the statutory scheme. Notwithstanding that nexus, contribution among antitrust wrongdoers does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority. Cf. *Bank of America* v. *Parnell,* 352 U. S. 29, 33 (1956). In short, contribution does not implicate "uniquely federal interests" of the kind that oblige courts to formulate federal common law.

(2)

Federal common law also may come into play when Congress has vested jurisdiction in the federal courts and empowered them to create governing rules of law. See *Wheeldin* v. *Wheeler, supra,* at 652. In this vein, this Court has read § 301 (a) of the Labor Management Relations Act, 29 U. S. C. § 185 (a), not only as granting jurisdiction over defined

areas of labor law but also as vesting in the courts the power to develop a common law of labor-management relations within that jurisdiction. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957). A similar situation arises with regard to the first two sections of the Sherman Act, which in sweeping language forbid "[e]very contract, combination . . . , or conspiracy, in restraint of trade" and "monopoliz[ing], or attempt[ing] to monopolize, . . . any part of the trade or commerce . . . ." 15 U. S. C. §§ 1, 2. We noted in *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 688 (1978):

> "Congress, however, did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition."

Accord, *United States* v. *United States Gypsum Co.,* 438 U. S., at 438, and n. 14; 2 P. Areeda & D. Turner, Antitrust Law ¶ 302 (1978). See 21 Cong. Rec. 2456, 2460, 3149, 3152 (1890).[15]

It does not necessarily follow, however, that Congress intended to give courts as wide discretion in formulating remedies to enforce the provisions of the Sherman Act or the kind of relief sought through contribution. The intent to allow courts to develop governing principles of law, so unmistakably clear with regard to substantive violations, does not appear in debates on the treble-damages action created

---

[15] Congress assumed the courts would refer to the existing law of monopolies and restraints on trade. See, *e. g., Mitchel* v. *Reynolds,* 1 P. Wms. 181, 24 Eng. Rep. 347 (K. B. 1711); *Darcy* v. *Allein,* 11 Co. Rep. 84, 77 Eng. Rep. 1260 (K. B. 1603). See generally P. Areeda, Antitrust Analysis 44–46 (3d ed. 1981); Letwin, The English Common Law Concerning Monopolies, 21 U. Chi. L. Rev. 355 (1954).

in § 7 of the original Act, 26 Stat. 210.[16] Floyd, *supra* n. 6, at 228. In the Senate debates of 1890, Senator Morgan described the type of authority given the courts:

> "Now, whoever recovers upon this statute, in whatever court he may go to, will recover upon the statute. It is very true that we use common-law terms here and common-law definitions in order to define an offense which is in itself comparatively new, *but it is not a common-law jurisdiction that we are conferring upon the circuit courts of the United States.*" 21 Cong. Rec. 3149 (1890) (emphasis added).

The Senator added that common-law actions in state courts might still exist, but recovery of treble damages would not be available, for its source is federal, not state, law. *Ibid.* This description of the power of federal courts under the Act suggests a sharp distinction between the lawmaking powers conferred in defining violations and the ability to fashion the relief available to parties claiming injury.[17]

In contrast to the sweeping language of §§ 1 and 2 of the Sherman Act, the remedial provisions defined in the antitrust laws are detailed and specific: (1) violations of §§ 1

---

[16] Section 4 of the Clayton Act, 15 U. S. C. § 15, which provides the private treble-damages action, derives from § 7 of the Sherman Act as originally enacted. See H. R. Rep. No. 627, 63d Cong., 2d Sess., pt. 1, p. 14 (1914). Congress repealed the original § 7 in 1955, Act of July 7, 1955, ch. 283, 69 Stat. 282, as being redundant of Clayton Act § 4, H. R. Rep. No. 422, 84th Cong., 1st Sess., 2 (1955); S. Rep. No. 619, 84th Cong., 1st Sess., 2 (1955).

[17] Courts, of course, should be wary of relying on the remarks of a single legislator, and Senator Morgan's comments are not unambiguous. Yet it is clear that when the Sherman Act was adopted the common law did not provide a right to contribution among tortfeasors participating in proscribed conduct. One permissible, though not mandatory, inference is that Congress relied on courts' continuing to apply principles in effect at the time of enactment. See, *e. g.*, *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S., at 273.

and 2 are crimes; (2) Congress has expressly authorized a private right of action for treble damages, costs, and reasonable attorney's fees;[18] (3) other remedial sections also provide for suits by the United States to enjoin violations[19] or for injury to its "business or property,"[20] and *parens patriae* suits by state attorneys general;[21] (4) Congress has provided that a final judgment or decree of an antitrust violation in one proceeding will serve as prima facie evidence in any subsequent action or proceeding;[22] and (5) the remedial provisions in the antimerger field, not at issue here, are also quite detailed.[23]

> "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc.* v. *Transport Workers, ante,* at 97.

That presumption is strong indeed in the context of antitrust violations; the continuing existence of this statutory scheme for 90 years without amendments authorizing contribution is not without significance. There is nothing in the statute itself, in its legislative history, or in the overall regulatory scheme to suggest that Congress intended courts to have the power to alter or supplement the remedies enacted.

Our cases interpreting the treble-damages action, see, *e. g., Hawaii* v. *Standard Oil Co.,* 405 U. S. 251 (1972); *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 401 U. S. 321 (1971); *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134 (1968), do not suggest that, in the past,

---

[18] Clayton Act § 4 (original version at Sherman Act § 7).
[19] Sherman Act § 4, 15 U. S. C. § 4.
[20] Clayton Act § 4A, 15 U. S. C. § 15a.
[21] Clayton Act §§ 4C–4H, 15 U. S. C. §§ 15c–15h.
[22] Clayton Act § 5 (a), 15 U. S. C. § 16 (a).
[23] Clayton Act §§ 7–11, 15 U. S. C. §§ 18–21.

we have invoked some broad-ranging common-law source for creating a cause of action. Nor does the judicial determination that defendants should be jointly and severally liable suggest that courts also may order contribution, since joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants. See *Atlanta* v. *Chattanooga Foundry & Pipeworks,* 127 F. 23, 26 (CA6 1903), aff'd, 203 U. S. 390 (1906). These cases do no more than identify the scope of the remedy Congress itself has provided. See Floyd, *supra* n. 6, at 227–231.

> "In almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Northwest Airlines, Inc.* v. *Transport Workers, ante,* at 97.

We are satisfied that neither the Sherman Act nor the Clayton Act confers on federal courts the broad power to formulate the right to contribution sought here.

## IV

The policy questions presented by petitioner's claimed right to contribution are far-reaching. In declining to provide a right to contribution, we neither reject the validity of those arguments nor adopt the views of those opposing contribution. Rather, we recognize that, regardless of the merits of the conflicting arguments, this is a matter for Congress, not the courts, to resolve.

The range of factors to be weighed in deciding whether a right to contribution should exist demonstrates the inappropriateness of judicial resolution of this complex issue. Ascertaining what is "fair" in this setting calls for inquiry into the entire spectrum of antitrust law, not simply the elements

of a particular case or category of cases. Similarly, whether contribution would strengthen or weaken enforcement of the antitrust laws, or what form a right to contribution should take, cannot be resolved without going beyond the record of a single lawsuit. As in *Diamond* v. *Chakrabarty,* 447 U. S. 303, 317 (1980):

> "The choice we are urged to make is a matter of high policy for resolution within the legislative process after the kind of investigation, examination, and study that legislative bodies can provide and courts cannot. That process involves the balancing of competing values and interests, which in our democratic system is the business of elected representatives. Whatever their validity, the contentions now pressed on us should be addressed to the political branches of the Government, the Congress and the Executive, and not to the courts."

Accord, *United States* v. *Topco Associates,* 405 U. S. 596, 611–612 (1972).

Because we are unable to discern any basis in federal statutory or common law that allows federal courts to fashion the relief urged by petitioner, the judgment of the Court of Appeals is

*Affirmed.*